**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

INLAND DREDGING COMPANY, L.L.C.,

      Plaintiff,

v.                                        Case No: 5:04cv280-RH/WCS

THE PANAMA CITY PORT
AUTHORITY, etc.,

      Defendant.

_____/

**ORDER FOR ENTRY OF JUDGMENT**

      This matter came on for trial to the court on September 12-16, 2005. For the reasons set forth at substantially greater length in the ruling announced on the record at the conclusion of the trial, I find that:

      1. Plaintiff (a dredging contractor) and defendant (owner and operator of an industrial port) entered a contract under which plaintiff was to dredge specified portions of the port. (Ex. DE-3.) The contract contemplated, and the relevant permits required, that the dredging be performed hydraulically, not mechanically, at least in substantial respects. The original contract price was $1,837,510, subject

to adjustments based on the yardage actually dredged.[1] Change orders not at issue in this litigation ultimately increased the contract price to more than $1,900,000.

2. Plaintiff performed the contract and is entitled to judgment for the unpaid portion of the adjusted contract price ($33,434.31), plus prejudgment interest ($2,956.88), for a total of $36,391.19.[2]

3. In the course of the work, plaintiff encountered differing subsurface or physical conditions within the meaning of General Conditions §4.03A.1 and 4.03A.4 (ex. DE-3 at page 00100-14). The conditions included abnormal obstructions and debris that significantly interfered with hydraulic dredging.

4. Plaintiff could not have discovered the differing conditions by any investigation that the contract required plaintiff to conduct. *See* General Conditions §4.03C.2.b (ex. DE-3 at page 00100-15). Nor could plaintiff have

---

[1] This price included additives that ultimately were incorporated into the project as performed.

[2] Plaintiff submitted a pay request calculating the unpaid amount as $33,434.31 as of June 7, 2003. (Ex. DE-38.) Although plaintiff requested payment at that time of $1,000 less than this amount (in order to hold the contract open for determination of a contract adjustment as addressed in the remainder of this order), performance of the contract had been completed, and I calculate interest as if the full $33,434.31 was properly claimed at that time. Under the contract, payment was due 30 days later, on July 7, 2003, and interest accrues thereafter, through the date of judgment, at 4%. (Ex. DE-3 at page 00050-4). Judgment will be entered on the date of this order, September 22, 2005. Interest on $33,434.31 for two years and 77 days at 4% totals $2,956.88. Any party who disagrees with these calculations may file a timely motion to alter or amend judgment pursuant to Federal Rule of Civil Procedure 59.

*Case No: 5:04cv280-RH/WCS*

discovered the conditions by any investigation it reasonably could or should have undertaken.

 5. Plaintiff gave notice of the differing conditions by letters dated November 25, 2003 (ex. DE-14) and December 5, 2003 (ex. DE-16). The letters put defendant on notice of plaintiff's position, as of that time, that plaintiff would be entitled to an adjustment of the contract price as a result of the differing conditions. The contract specifically authorized such an adjustment. General Conditions §4.03C (ex. DE-3 at page 00100-15).

 6. The project engineer asserted by letter dated December 5, 2003 (ex. DE-15) that discovering the differing conditions had been plaintiff's responsibility. The engineer never receded from this position, which was incorrect. The engineer's letter put plaintiff on notice of defendant's position, as of that time, that plaintiff was not entitled to an adjustment of the contract price based on differing conditions.

 7. In evaluating plaintiff's assertion of differing conditions, the engineer was obligated to act impartially, not as a partisan in favor of the owner. *See* General Conditions §9.09-B (ex. DE- 3 at page 00100-41). In violation of this duty, the engineer evaluated plaintiff's assertion of differing conditions as a partisan for the owner. The engineer made no investigation of whether, in fact, conditions such as those that were encountered met the contract's definition of

differing subsurface or physical conditions.

8. On December 15, 2003, plaintiff's chief executive officer and defendant's executive director had a lengthy discussion concerning the site conditions and the parties' respective responsibilities. The occurrence of the discussion and some of its content were confirmed by letter from defendant to plaintiff dated December 16, 2003. (Ex. DE- 17.)

9. As a result of the December 15 discussion, defendant hired a mechanical contractor at defendant's expense to remove obstructions and debris. Defendant ultimately paid the mechanical contractor more than $300,000 for work performed on this project. The work substantially furthered the project and made it possible for plaintiff to complete the project hydraulically.[3]

10. Defendant did not assert, and plaintiff did not agree, either in the December 15 discussion or at any time, that the defendant's retention of the mechanical contractor would resolve any claim plaintiff might assert for an adjustment of the contract price based on the differing conditions.

11. Plaintiff did not assert, and defendant did not agree, in the December 15

---

[3] Although defendant now seeks by its counterclaim in this action to recover from plaintiff the amount paid to the mechanical contractor, that is a litigating position that was neither asserted nor contemplated at the time. To its credit, defendant undertook at the time to provide the mechanical dredging at its own expense, in order to remove or mitigate the abnormal obstructions and debris. That defendant did so, notwithstanding the engineer's unfounded legal position, demonstrated considerable good faith.

discussion or at any time, that plaintiff would still be entitled to an adjustment of the contract price based on the differing conditions, notwithstanding defendant's retention of the mechanical contractor.

12.  In the period between December 15, 2003, and June 16, 2004, there was no communication between plaintiff, on the one hand, and either defendant or the engineer, on the other hand, on the subject of whether plaintiff did or did not intend to make a claim for an adjustment of the contract price based on differing conditions, nor on the subject of the amount of any such claim that might be asserted.  Defendant did not know whether a claim would or would not be asserted and did not know the amount (or even the order of magnitude) that might be claimed.

13.  Plaintiff completed the required dredging by April 9, 2003.

14.  On June 16, 2003, plaintiff delivered to defendant and the engineer a detailed claim for an adjustment of the contract price based on differing site conditions.  The amount of the claim was $1,629,255.  (Ex. SE-3.)  This claim, if allowed, would have increased the contract price by approximately 85%.

15.  The June 16 submission was the first notice provided by plaintiff since the parties' December 15 discussion that plaintiff still asserted an entitlement to an adjustment of the contract price based on differing conditions.

16.  Prior to the June 16 submission, plaintiff had never given any notice, or

even any hint, that it might assert a claim approaching this magnitude.[4]

17. Had plaintiff asserted as of December 15, 2003, or at any time while plaintiff was engaged in dredging, a claim for adjustment of the contract price in a significant amount, defendant could have attempted to protect its interests, including by attempting to negotiate a settlement. Any such negotiation could have included an attempt to gain concessions in exchange for defendant's agreement to retain the mechanical contractor at defendant's own expense. Any such negotiation also could have included an attempt to cap defendant's exposure.

18. At least at the outset and for some period thereafter, defendant also could have chosen not to go forward with the additives portion of the contract. The additives provided for dredging of areas not covered by the base contract. Had defendant opted not to go forward with the additives, its total expenditures would have been significantly reduced. That defendant chose to go forward with the

---

[4] In a letter dated December 3, 2005, plaintiff cryptically referred to "work that is not within the scope of the contract." (Ex. DE-48.) With the letter, plaintiff provided a schedule of hourly rates. Even if this could be understood as a reference to any differing conditions claim, these rates did not reasonably give defendant notice of the amount, or even the order of magnitude, of any claim that might ultimately be asserted. This is so both because defendant did not know how many hours plaintiff might assert were expended *because of* the differing conditions, and, perhaps more importantly, because it was only after this time that defendant engaged a mechanical contractor to remove substantial obstructions and debris. Surely the hiring of the mechanical contractor could reasonably have been expected to reduce the total amount of, and even the hourly rates used in computing, any claim. In any event, plaintiff ultimately did not base its claim on these or any other hourly rates.

additives, at the contract price and in light of defendant's available funds, does not necessarily indicate defendant would have chosen to go forward with the additives at a substantially higher price (adjusted based on differing conditions) and in light of a significant reduction in available funds (based on the need to defend and possibly pay an adjusted price for the base portion of the contract). It is more likely than not that defendant still could have chosen not to go forward with the additives as of December 15 and for at least 44 days thereafter (through the last time at which, under any reading of the contract, plaintiff could give notice of the amount of any claim).

19.  The contract required plaintiff to inform defendant of the detailed basis for and amount of any claim for an adjustment of the contract price within 30 days after a triggering event. The required information was variously described as (a) "a detailed claim setting forth Contractor's right to recover any additional costs and lost time as provided in the General Conditions" or (b) "[n]otice of the amount of the claim with supporting data." *Compare* Supplemental Conditions §1.2 (ex. DE-3 at page 00800-1) (former) *with* Supplemental Conditions §1.5 (ex. DE-3 at page 00800-2) (latter); *see also* General Conditions §10.05A (ex. DE-3 at page 00100-43) (superseded by Supplementary Conditions to extent of any inconsistency but apparently incorporated by reference into Supplementary Conditions §1.2) ("[n]otice of the amount or extent of the Claim, dispute, or other matter with

supporting data").

20. The triggering event from which the 30 day period ran was inconsistently described as (a) the "occurrence" giving rise to the claim, or (b) the giving of "written notice" of "the incident" giving rise to the claim (with the written notice required to be given within 14 days of "the incident"). *Compare* Supplemental Conditions §1.5 (ex. DE-3 at page 00800-2) (former) *with* Supplemental Conditions §1.2 (ex. DE-3 at page 00800-1) (latter); *see also* General Conditions §10.05A (ex. DE-3 at page 00100-43) (superseded by Supplementary Conditions to extent of any inconsistency) (requiring notice of the amount or extent of any claim, with supporting data, within 60 days after "the start of" an "event" giving rise to the claim).

21. Plaintiff's claim as submitted on June 16, 2004, was untimely under any of these formulations. The "occurrence," "incident," or "event" giving rise to plaintiff's claim began prior to November 25, 2003. By December 15, 2003, it was clear that there were differing site conditions. As of December 15, 2003, plaintiff could have submitted a detailed statement of the basis for, and could have provided meaningful data concerning the amount of, any claim. By April 9, 2003, all dredging was completed, and the differing conditions were no longer having any effect on plaintiff's performance of the contract. By some point well prior to May 14, 2004 (the last weekday more than 30 days prior to the submission of the claim),

plaintiff could have determined the full amount of its claim, using the same methodology as in the claim ultimately submitted.[5]  Plaintiff's claim was not submitted within 30 days of any of these dates.

22.  The issue of whether plaintiff can recover notwithstanding its failure to comply with the contract's deadlines is governed by Florida law.  Ultimately, the issue is how the Florida Supreme Court likely would resolve this question.  The parties have cited no controlling decision of the Florida Supreme Court, and I am aware of none.

23.  The United States Court of Appeals for the Eleventh Circuit addressed a similar issue under Florida law in *Marriott Corp. v. Dasta Constr. Co.*, 26 F.3d 1057 (11th Cir. 1994).  There a building contractor asserted a claim for delay.  The jury returned a verdict for the contractor.  The district court entered judgment as a matter of law for the owner.  The Eleventh Circuit affirmed.  A basis of the ruling was the contractor's failure to give notice of its claim within seven days of the commencement of the delay as required by the contract.  The court enforced the

---

[5] Plaintiff notes that some of the expenses were paid by credit cards and that receiving credit card statements takes some time.  But one need not wait to receive a credit card statement to know the amount of an expense that has been incurred.  Vendors provide receipts, and credit card companies provide information on request prior to statement dates.  Identifying equipment repair costs might have been more difficult but could have been accomplished with reasonable effort.  And in any event, under no plausible reading of the contract did the 30-day period begin to run only from the date on which damages could be calculated.

seven-day limitation despite evidence that the owner announced in advance that it would not honor any delay claims (just as plaintiff asserts in the case at bar that the engineer announced by his letter of December 5, 2003, that he would not honor any differing conditions claims) and despite evidence that after the delay issue arose the owner orally assured the contractor that his claim would be protected (plaintiff does not assert defendant gave any such assurance in the case at bar, and defendant plainly did not).  If, as the Eleventh Circuit held in *Dasta*, the contractor's failure to comply with the contract's claims deadline precluded recovery, then plaintiff's failure to comply with the contract's claims deadlines in the case at bar also precludes recovery.

  24. Similarly, in *Tuttle/White Constructors, Inc. v. State Dep't of General Svs.*, 371 So. 2d 1096 (Fla. 1st DCA 1979), the Florida intermediate appellate court with jurisdiction over the location at issue in the case at bar upheld a decision barring a contractor from recovering on a delay claim that was not asserted within 20 days as required by the contract.  At least insofar as revealed by the abbreviated discussion of the facts set forth in the *Tuttle/White* opinion, the case is not meaningfully distinguishable from the case at bar.  If the contractor's failure to comply with contract's claims deadline precluded recovery in *Tuttle/White*, then

the same is true in the case at bar.[6]

25. Plaintiff's claim for an adjustment of the contract price based on differing conditions is barred by plaintiff's failure to assert the claim in the manner and within the time required by the contract.

26. Defendant's claims for liquidated damages and for recovery from plaintiff of the amounts paid to the mechanical contractor are unfounded on the merits and are barred by defendant's failure to assert the claims in the manner and within the time required by the contract.

For these reasons,

IT IS ORDERED:

The clerk shall enter judgment stating, "Plaintiff Inland Dredging Company, L.L.C. shall recover from defendant Panama City Port Authority the sum of Thirty-

---

[6] These holdings are supported by the purposes of notice and claims provisions of this type. The purposes are similar to those of notice provisions of the type addressed in *T. J. Stevenson & Co. v. 81,193 Bags of Flour*, 629 F.2d 338 (5th Cir. 1980). The purposes include encouraging parties to negotiate a resolution of any dispute promptly and promoting commercial good faith. 629 F.2d at 360. Encouraging good faith, in this context, is equivalent to affording the adverse party an opportunity to cure or minimize any harm. 629 F.2d at 361. Thus courts properly "will not hesitate a moment" to cut off a party caught "lying in the grass with the thought of increasing his damages." *Id.*, quoting J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code §11-9, at 344 (2d ed. 1972). While it cannot be said in the case at bar that plaintiff deliberately lay in the grass to increase its damages, it did lie in the grass to avoid confronting these issues (or negotiating about them) until the work was done and it was too late for defendant to do anything other than defend or pay the claim.

Three Thousand Four Hundred Thirty-Four and 31/100 Dollars ($33,434.31) as principal, and Two Thousand Nine Hundred Fifty-Six and 88/100 Dollars ($2,956.88) as prejudgment interest, for a total of Thirty-Six Thousand Three Hundred Ninety-One and 19/100 Dollars ($36,391.19), all of which shall bear further interest as provided by law.  All other claims in this action are dismissed with prejudice."

      SO ORDERED this 22d day of September, 2005.

                                            s/Robert L. Hinkle
                                            Chief United States District Judge